## RAILROADS.

[Lucas Circuit Court, October 14, 1893.]

### TOLEDO (CITY) v. L. S. & M. S. RY. CO.

1. UPON CONDEMNATION OF OLD RAILWAY BRIDGE OVER PUBLIC STREET, COMPANY OBLIGED TO BUILD A NEW ONE, NOTWITHSTANDING DOUBTFUL OR DEFECTIVE DEDICATION.

It is not necessary that a street should be placed in prime condition for public travel in order to lay obligation upon a railway cutting through it to build or maintain a bridge. And where it appears that prior to or at the time when a railway company acquired a right of way over certain land, a street had been cut out, and prepared for public use to such an extent that wagons passed over it, and the railway company, of its own accord, erected a bridge over its tracks, it will be presumed that the public had legally acquired a right to such street, notwithstanding technical defects in the dedication. And the railway company having full knowledge of the facts, and building the bridge voluntarily, it can hardly be presumed that it did so for private interests in that vicinity or as an evidence of general good will, but that it regarded the street as a public highway and acquiesced in it as such. The railway company is, therefore, upon condemnation of the old bridge, obliged to construct a new one.

·2. CONDEMNATION BASED ON PARTITION PLAT CHARGES PLAINTIFF WITH NOTICE OF STREETS SHOWN THEREON.

Condemnation proceedings based upon a partition plat which shows a proposed street, giving its name, charges a plaintiff railway company with notice of the existence of such street.

APPEAL from the Court of Common Pleas of Lucas county.

BENTLEY, J. (orally.)

The questions in this case are worthy of more elaborate treatment than we shall be able to give them in announcing our opinion.

In April, 1853, the Northern Indiana Railroad Co., the predecessor of the defendant, the Lake Shore and Michigan Southern Railway Co., began proceedings in the probate court of this county for the appropriation of a strip of land on the northerly side of subdivision 2 of river tract No. 5 in this city, for a right of way for its contemplated railroad, said strip being about 150 feet in width. On June 10, 1853, such appropriation was completed by the payment of the amount of the award in the probate court. Some two years later said railroad company caused the grading necessary for its roadbed, through said strip lengthwise, to be done, and in so doing made a cut at the point where Broadway crosses said right of way at the present time, to the depth of about twenty feet. Over this cut, and at that point, the company then, at an expense to itself of $1,800, constructed a substantial bridge " to accommodate the public

travel," as it says in its answer in this case; and it and its successors in the title and use of said railroad, including the defendant, have, at their own expense, maintained a bridge there ever since, which has been used constantly by the public ever since Broadway has been a public street until a time not long prior to the commencement of this action, when the bridge at that place had become insufficient for the needs of the city, and unsafe and dangerous to those who might have occasion to pass there, and especially unsafe for the passage of street cars which the city had authorized to run across there. Thereupon the city having condemned the bridge as unsafe, notified the defendant it was required to build a new bridge at that point sufficient for the accommodation of the public travel along Broadway, which was largely increased, and the street tracks, bearing heavy electric motor cars, having been laid thereon since the present bridge was built. The company refusing to construct such new bridge, the city began this action for a mandatory injunction to compel the defendant to construct it. The railway company admits that a new bridge over its track at Broadway is needed, and that it is competent for the court to grant the relief prayed for if the company is under obligation to maintain any bridge there; but it denies that it is so obliged, for the reason while it is admitted that Broadway was at the commencement of the action, and is now, a public street of the city, it was not such street when the predecessor of said defendant appropriated said right of way, nor when it constructed its grade, and it is claimed that in constructing said original bridge, and in maintaining and renewing it from time to time, the Northern Indiana Railroad Company, and afterwards the defendant, each acted under some misapprehension of its rights and duties, or that each acted in that regard simply by reason of the complaisance of certain officers or agents, or their desire to manifest their general good will, and that there was, in fact and in law, no such obligation upon the railroad companies; that this construction and maintenance of a bridge in no wise interferes with the right of the defendant nor to maintain its denial that there was any original liability of the Northern Indiana Railroad Company to construct any bridge there, or any liability of it or the defendant at any time since to maintain one there. On the other hand, the city claims that there was a valid and existing street then at the time that the appropriation proceedings were begun and were concluded and when the track was graded.

The testimony which was produced before us brings up many interesting facts in the history of the city, and enables us, almost judicially, to refute the ancient slander that the Maumee country was unhealthy; because a large company of hale and hearty persons appeared before us as witnesses, who had enjoyed the felicity of a residence in this salubrious region, some of them for ten, others for fifty and sixty and even seventy years, and their appearance would indicate that the conditions here were favorable to longevity, at least.

The testimony bore more particularly upon the situation of Broadway in the old days, before this appropriation of 1853, and during that year and during the years since.

There is a statute bearing upon this matter, found in sec. 5284, Rev. Stat., which reads as follows:

"A company may, whenever it is necessary in the construction of its road to cross a road or a stream of water, divert the same from its location or bed; but the company shall, without unnecessary delay, place

such road or stream in such condition as not to impair its former usefulness; and any or all railroads hereafter constructed, which shall cross any avenue or public highway leading from a city of the first or second class, to a public cemetery of such city, situate within or without the limits of any such city, shall be constructed so as either to pass under or over such avenue or public highway, at such elevation or depression, as the case may be, as will allow the unobstructed passage of all wagons, carriages or other vehicles which it may be necessary for any person to use upon such avenue or public highway."

And it is claimed that by reason of this statute, a statutory liability was incurred by the predecessor of the defendant to build this bridge and by itself and its successors to maintain it. It is also claimed that, independent of a statute, if there was a public highway across the right of way of a railroad company at the time it acquired such right of way and constructed its road, there was a common law obligation resting upon the railroad company, in reason and in fairness to make it possible at that point to safely cross its railway, and to erect and maintain such structures as would be reasonably necessary for the public highway at that place.

As is well understood, the principal controversy in this case is as to whether Broadway was, in legal acceptation, a road or street of the city, at the time of this appropriation, or, as another phase of the question might put it, at the time that the grade of this railroad was constructed at that point; and to this question mainly the testimony of witnesses and the evidence introduced were addressed. It was claimed upon the part of the city that before the acquiring of any right by the original railroad company at this point, there was a legal and valid establishment of Broadway at that point, and it is also urged on behalf of the city, that whether that is true or not—that is, whether the road had been established according to the forms of any statute bearing upon it—there was in fact a public highway there, recognized and used by the public, and an obligation upon the city to keep it in repair as a street of the city; and if this road was not laid out and established by the ordinary processes under the statutes, it had become so by a common law dedication upon the part of the owners of the lands and an acceptance of the dedication by the public authorities. The contention of the city is, that in either view of the case the obligation of the railroad company to construct and maintain the bridge was equally binding.

It is common learning, that in order to establish a public highway without the ordinary forms prescribed by the statutes, the owners must be willing to dedicate the land for the purpose, and they must in fact dedicate it, and in addition to that, the public authorities must accept the dedication. If either of these things is wanting, there is in law no public highway at the point. This being the law, it became and was proper to receive any testimony or evidence which would bear upon either of those phases of the question—that is, which would tend to show a dedication upon the part of the owners, or its actual acceptance by the city and public authorities, or the public.

During the introduction of the evidence in the case, various objections were made by the defendant's counsel to the introduction of evidence as to certain things done by the city council by way of approving of certain maps which had been made, which exhibit Broadway as extending over this point in question before 1853 ; the ordinance of February 21, 1852, and the reports of the assessors in that case ; the ordinance

or resolution by the council approving the Hart map—so-called; the ordinance of September 15, 1853, established the grade of Broadway; the ordinance of December 9, 1853, under which a contract was made with one Conolly for grading Broadway; and various other items which were claimed by the railroad company to be inadmissible as evidence, on the ground that even if said proceedings were had they did not accomplish the purpose which the city claims was in fact accomplished. All this evidence, and I will not go over it further in detail, was received temporarily by the court, with an intimation that it might be hereafter ruled out upon application by the attorneys of the railroad company, if, upon further investigation, we should conclude that it was inadmissible. In considering the case, and in view of our understanding of the law regarding the facts that may bear upon the question of dedication, we think that all of the testimony, each item of evidence thus received, should be considered by the court; and the motion to exclude it will be overruled, and it will be considered for such purposes for which, as we think, it is properly receivable.

There was a great deal of testimony given through the course of the trial as to there being what was called in those days the " river road " between Toledo and Maumee. Upon the one hand, the city sought to show that this road, however called, was a road that since a time long prior to April, 1853, followed substantially the course that Broadway now takes, and especially at the point where Broadway now crosses this railroad. On the other hand, it was contended by the defendant that the river road was wholly northerly from that point. And surveys of that road made at various times were introduced, and testimony was addressed to the point as to where in fact such a road was used. Now upon this question of fact, so far as it may be necessary for us to announce any opinion regarding it to conclude from all the light that we have been able to focus upon it, that the river road, as legally laid out and established, was not at the point in question, over what is now the line of Broadway; but was northerly of Broadway, and that as a general thing the travel along what was called the "river road" went northerly from the place in question. There is, however, testimony tending to show that there was a public travel over the line of what is now Broadway at this point, and that whether it followed the legally established river road or not, it was the customary way for the public to travel, a great many years, and that in fact there was a public road there, which under the charter of the city and the laws applicable to the case became one of the public streets of the city, however named, or whether having any name or not. As I say, there was some testimony tending to show that. Some of the witnesses stated their recollection that that was the case. We are inclined to think that there was quite an amount of travel from time to time over what is now called Broadway, perhaps this side of the ravine which was largely spoken of by the witnesses, and this side of the railroad crossing, and perhaps again on the other side. We would be unable to conclude, however, that this travel was sufficient to establish by a mere user a road there; the length of time and character of travel would not warrant such a conclusion; and neither is there sufficient testimony that the road was so used at this point so uniformly and long, with the knowledge of the proprietors of the land, that any common law dedication might be presumed or found to have been made by the owners. If there was a street there, we think it must be gathered from other considerations than the mere fact that the public had traveled over there a long while

and had established it by user. Better than the recollection of witnesses as to roads among the trees and through the woods, many years ago, having more probative force, we think are the records that were made at the time by skilled persons actually measuring the point in question and surveying it and noting their observation at the time, when there is no chance that there was any idea of controversy, present or future, over the facts they thus state. And we are inclined to think that the road which was followed by the travel in general at this point deflected to the north, and went around the head of this ravine, rather than right through it at this point. We gather this not only from the testimony of the witnesses as to the actual use of the road there but from the evidence showing the situation and character of the land at this point in question.

There is other evidence bearing upon the main issue here which we will now proceed to consider. I may not state it in its proper order, but will endeavor to follow the line of the main features, so that it may be seen upon what basis we have placed the conclusion at which we have finally arrived. As I said, we think it is proper to consider all of the facts and circumstances bearing upon the situation here about 1852, or shortly before that, and at some time after that; the acts of the parties owning this land, and the action of the public authorities regarding this street. I will recite now some of these things that might be considered as bearing upon one or the other of these points.

In 1847, there was a plat of the streets and alleys dedicated to public use, upon which was shown this end of Broadway as dedicated to the public as far as Newton street and not further. On September 4, 1851, there was quite a large number or several persons, who owned what was called "River Tract No. 5." The railroad strip of land was taken off the northerly side of River Tract No. 5, or a portion of it. September 4, 1851, there was a suit begun in the court of common pleas of the county between all of the owners of this tract and some other tract, in order to obtain a partition of the lands between the several owners. Commissioners were appointed in the course of that proceeding under the statute, and finally they made a report on February 23, 1852, in which they partitioned the land. A plat accompanied their report, and was made a part of it, which was a map of the lands in question. Their report was written upon this map, and in order to understand that report, or to determine what tracts were set off to each of the owners, a resort must be had to the plat. They set off to one of the owners a tract which they designated as subdivision 2 of this river tract No. 5, the sides of which came up to the north line of river tract 5. This subdivision 2 was set off to one of the parties to the action named Neiswenger. This map exhibits a prolongation of Broadway from Newton street in the direction of Broadway that had already been dedicated, through the entire tract of lands as far as the city limits, now South street. The plat or map showed this street, and upon it was written "Broadway," but there were no words in the report which said that that was a street which the commissioners had laid out or dedicated, but which simply exhibited a street there and called it "Broadway." Upon this street, however, some of these subdivisions were bounded. Subdivision 2, of which I have spoken, extended both sides of this projected street, but other subdivisions were bounded upon the centre of this street. This report and return of the commissioners was confirmed by the court, and apparently the parties acquiesced in the partition. I will repeat that the report was made and

confirmed February 23, 1852.  On February 21, 1852, the council passed an ordinance extending Broadway along the very line that two days afterwards appeared in the report of these commissioners, and providing that the land be condemned for the purposes of a public street there, and appointing commissioners to assess the damages to the owners.  It seems that the commissioners who were appointed were C. C. Helsey, C. D. Woodruff and P. H. Shaw.  On February 23, 1852, they made a report stating that they had viewed this line of Broadway to estimate the damages and found that no damages would be suffered by the owners.   That seems to be the last of that proceeding, so far as it is exhibited in the public records of the council.  On March 6, 1852, the map which is called the Hart map—showing Broadway established as indicated in this partition plat, and as also indicated in the ordinance of the council just alluded to, was by ordinance approved by the council.  On April 23, 1853, Northern Indiana Railroad Company filed its petition to appropriate this land for railroad purposes.  On May 23 and 25, 1853, there was a verdict of the jury awarding damages, and June 10, 1853, the company paid the money awarded into the probate court (the probate court having confirmed the verdict, it seems, May 25, 1853, and at the same time that it was returned).  September 15, 1853, an ordinance was passed by the council which established the grade of Broadway along this line clear through to South street—the city limits.  On December 9, 1853, an ordinance was passed for the actual grading of Broadway along this line, and under this ordinance not long afterwards a contract was awarded to one Conolly to do the grading.  In the line of evidence and testimony there comes next in chronological order the testimony of Mr. Marston, small portions of which I will read.  We regard his testimony as important.  He was a surveyor, a civil engineer, and he came here December 4, 1853, and says he was in the service of the city engineering department, and thereupon this question was asked him:

"Q.  You may go on and state what the work was, or service, where it was performed and what it was about?  A.  Well, the first that we went on to Broadway was May 22d.  We ran levels over Broadway in 1854."

"Q.  Whereabouts did you begin?  A.  I don't remember where, but I think we—my recollection is that we ran the entire length of it."

The court:  Q.  You commenced that day and ran the lines where?
"A.  I am not positive—"

Mr. Potter:  "Q.  What was the day?  A.  May 22d."

"Q.  Under what contract for improvement was that—in what contract?  A.  I don't think it was under any contract.  I think it was merely for the purpose of making a profile, or something of that kind."

And he worked only that day at that time.

"Q.  And where did you start from and where did you go to?  A. As I said before—I wouldn't say positive, because we only ran levels over Broadway.  I should think by that that we went over the entire length of it—because the next time we were there I put down that we ran the levels over a part of Broadway, and if we hadn't gone over the whole of it at that time, I should have probably have noted then that it was only a part."

Lower down he says in answer to this question:

"Q.  At that time what was the condition of things up there so far as Broadway was concerned—what condition was that locality in or the road in?  What did you find?  A.  I won't say positively, but I don't

think there had been anything of any grade made then ; I think as far as around the railroad—all beyond the railroad—there had been no grade ·of any consequence at all; my recollection ·is that there was not any. As near as I remember it, we ran that profile as a sort of a test of the levels of some previous levels which had been taken before."

Then he speaks of the condition in which he found the ravine, and further over is the further question :

" Q.    What was the condition of Broadway as to being opened up when you went there to run these levels the first time ?    A.    I can't say anything more about that first time; that I was there I have said.    The next time I was there was September 20, 1854.    I don't know any reason why we didn't go up there any oftener except that it was the year of the ·cholera and there was not much work done.    There was not any engineering work done there during that interval, because if there was any done, why, I went.    Then I ran levels over a part of Broadway ;    and at that time the grade had been commenced on both sides of the ravine and the ravine partly filled up and the road had been cut out beyond the railroad—I don't remember how far, but at least beyond Western avenue— ·cut out its entire width at least beyond Western avenue, and it was partly graded down on both sides of the ravine and the ravine partly filled up, September 20th.    At that time the street was under contract ·with Conolly."

Then Mr. Marston proceeds to state regarding the river road and ·some surveys regarding that.

The contract being made with Mr. Conolly at some time previous ·to the time that Mr. Marston speaks of here, the grading was completed in 1855, and on November 13, 1855, an assessment to pay him was confirmed by the council.    Some time after this, the railroad company being assessed to pay a portion .of this grading which had been done under Mr. Conolly, refused to pay it.    Suit was brought by Mr. Conolly against the railroad company to compel its payment, and this finally went to the Supreme Court, the case being reported as Railroad Co. v. ·Conolly, 10 O. S., 159, and the railroad company was compelled to pay this assessment.    When the railroad company came to make its grade, which was perhaps in 1855 and 1856, it cut down the grade at this point ·of extended Broadway about twenty feet, and, as I have already recited, it constructed at an expense of some $1,800 this bridge, it says, to accommodate the public travel.    It and its successors are to maintain that bridge, ·or a bridge, at that point, until the present time, and from that time on the public have had possession of Broadway, and travelled it constantly, and the city authorities have treated it as a public street.    Everybody seems to have acquiesced as if that ordinance was valid.

On the other hand, the claim by the railroad company is that there was no street there, at the time that it acquired its right of way, viz. : in 1852 and 1853—in the summer of 1853.    It says that the ordinance ·passed by the council in 1852, seeking to condemn that property for street purposes, was utterly void, and of no effect, because while that pro- ·ceeding might have been in conformity to the original charter of the city which had been granted years before, yet in the meantime the new constitution of 1851 had been adopted, and there was no provision made, .as required by the new constitution, · for· the assessment of damages to ·the property owners by a jury, where property was condemned for public purposes, and that as certain sections of the constitution required that, an ·attempted condemnation under the old form of proceeding was void by

the very force of the new constitution.  As a strict matter of law, we suppose that that was true; we suppose that the ordinance thus passed by the council did not effect the legal condemnation of that property, did not estop nor prevent the owners from asserting ownership over it, if they had seen fit; but it will be remembered that the new constitution had gone into effect but a short time before that, and there was yet no decision of the Supreme Court construing these new provisions or defining what their effect would be upon such proceedings taken under old charters or old laws.  The court afterwards did pronounce upon that subject, in a case reported in the 2 O. S., I believe.  But it would seem that no party connected with the transaction here in view regarded the effect of the provisions of the new constitution.  The attorney who represented the railroad company in defending against that assessment suit of Conolly to enforce that assessment (being the Hon. Morrison R. Waite) did not urge this point, but seemed to rely upon the claim that as the railroad company simply had an easement or right of way for public and railroad purposes, it was not the owner of lands in such a sense on either side of Broadway as would warrant an assessment against it as the owner of land.  The council, after the passage of this ordinance, passed other ordinances, on several occasions, regarding and fixing the grade of the street.  They sent their engineers upon it to make surveys; they surveyed the road; they levelled it, and corrected those levels on other occasions, and awarded this contract to Conolly.  And it seems from the testimony fairly considered, that prior to the time that the railroad company had acquired its rights under these condemnation proceedings, for some purpose or other, and by some person or other, the street, as extended upon these maps and plat, had been cut out.  Mr. Marston went there September 20, 1854.  At that time the street had been cut out to its full width, and he noticed particularly that the trees on either side were so tall that they met in the center, thereby embowering the road.  And that in connection with the testimony of the witnesses—quite a number of them—who resided in the vicinity at that time, some of whom owned property in the vicinity, to the effect that the road had been cut out, and the trees had been sufficiently cut out that wagons could go along there, and some testimony—quite an amount of it, we might say—that wagons went over some portion of this extended Broadway, and were accustomed to pass along there before that time, and the fact that no owner of land interfered in any way, and the action of the railroad company in 1853 regarding the bridge and regarding the grade, and all of the circumstances surrounding the situation at that time, lead us to conclude that every person concerned—attorneys, the council, officers, owners of land and everybody—supposed that Broadway had been legally acquired by the public as a roadway.  And the railroad company, acting upon that supposition, went to this expense of some $1,800, to make that bridge.  It is noticeable also that when the railroad company began these condemnation proceedings it described the tract of land that it wanted to appropriate as a strip off the northerly side of this subdivision 2.  This subdivision 2 was not known in the records other than as it was shown upon these proceedings in partition and the record of that plat, which was afterwards placed among the city records.  The railroad company, therefore, seemed to be cognizant of these partition proceedings and what had been done regarding them when it entered upon its appropriation proceedings.  So far as it is made to appear from the testimony, all the proprietors acquiescing in these

proceedings dealt with the property and acting exactly as they would if this Broadway had been actually laid out.

It is claimed upon the part of the railroad company that the intention of the owners to dedicate this street is not sufficiently evinced by this plat. Counsel sought to distinguish this case from one reported in 19 O. S., because in the latter case the report of the commissioners in partition had said in so many words that the streets and alleys designated on that plat which they returned were "hereby forever dedicated to public purposes," or words to that effect; but that in the present case there were no such words of dedication, and nothing to indicate a dedication, except the showing of the projected street upon the map, and the name written or printed upon it. But we are unable to conclude that as far as the proprietors are concerned this makes really any substantial difference in the rules to be applied to the two cases. We are clearly of the opinion that those circumstances evince a willingness and an intention upon the part of the proprietors, so far as they were concerned, to dedicate such a street, substantially as laid down upon this partition plat. All the acts which had been done theretofore, all the acts which accompanied this and followed it from that time, would seem to be in line with this idea; that they were willing that this piece of land should be thus used for a public street, and that they intended that it should be dedicated to the public for that purpose. We think the railroad company was fairly charged with notice of that fact, and notice and knowledge of these circumstances and the intent of the proprietors.

Now when it came to grade its road, all these matters were very fresh in the memory, and were open, many of them, to the sight; where the public had traveled; how far Broadway was cut out; how much it had been traveled; and everything that bore upon the question would seem to have been then fairly before their eyes, to determine the question whether or not it was then and there a street or otherwise. Acting upon what we must suppose was fairly and fully known to it, it voluntarily built this bridge at this large expense. We are unable to think that it did it for the mere purpose of obtaining the approval of any private persons, or of evincing a general good will towards any person that might possibly want to stray along that way and go over that portion of the track. We are inclined to think that at that time, its officers and agents regarded it as a public street, acquiesced in it, found themselves, as they thought, in a situation where they would be required to expend a large sum of money to build and maintain a bridge.

This may bear not only upon other portions of the case, but upon that portion of the testimony which might be regarded as otherwise somewhat doubtful as to the real situation of the matter. At that time it would seem that the city, so far as it could or would naturally be expected to, had acted upon the supposition that that was a public street, and so far as it was necessary for the city to accept any dedication that might have been made or acquiesced in by the proprietors of the ground, such acceptance had been shown by all of these acts.

We think it would not be necessary that a street should be placed in prime condition for public travel in order to lay upon a railroad company cutting through it the obligation to maintain a bridge over it. That it was not graded to any great extent at that time is quite probable. Some of the testimony indicates, however, that the grading had been begun there; some of the testimony indicating possibly a *purpose* to *begin* a grade at that point, and to begin it there first to accomplish some

public purpose, perhaps. However that may be, we find that very soon after the appropriation proceedings had been taken by the railroad company there was something of a grade established there. We think the testimony fairly warrants us in concluding that the street had been cut out before that time, and that to all intents and purposes it might have been regarded as a street, in possession of the public authorities at the time of the appropriation.

There is another question that we will allude to. In this case the arguments addressed to us were for the most part as to the situation of affairs at the time the appropriation proceedings by the railroad company were instituted and completed. We are not at all certain that that is the time which actually fixes the duty of the railroad company. It will be noticed that the statute says a company, "Whenever it is necessary in the *construction* of its road to cross a road," etc. The duty comes to the railroad company when it *constructs* its road across a road. Now at that time the inquiry would at least be interesting as to whether, if there was a road at the time of the construction of the railroad, it makes a difference just what the situation was at the time that the railroad company first appropriated it as a right of way. Frequently it happens that a right of way is condemned by a railroad company years and years before a road is actually constructed upon it, or before any grading is done; and now if during those intervening years it would be impossible for the public to cut a road for a public way over the projected right of way of a railroad company, and construct a road so that the railroad company would, under the law, be obliged to maintain a proper crossing over it, it might then be urged that the time of the beginning of the appropriation proceedings was the time to be considered. But is that true—can it be regarded as a fair statement of the law upon the question? For myself, it seems that the inquiry is very pertinent—what was the condition at the time of the construction of the railroad itself? If at that time there was, either by dedication, or by condemnation, or any other legal proceedings by which there was in fact and in law, a public street over the railroad, it would seem to me to present a case where the railroad company would be obliged to keep up the bridge or crossing. If it had been condemned after proceedings by the railroad company, it is possible that the fact that it might thereafter, by constructing its line, be obliged thus to construct and maintain a bridge over that point, should be considered in determining the proper rule of damages to be applied in such a case.

Now in addition to these considerations which lead us to the idea that the law would require the railroad company to construct a bridge at this point, it may be said that that is not just the question presented to this court at this time. It is not a question of the original construction of a bridge whether after the railroad has in fact constructed a bridge at its own expense, maintained it, and acquiesced in the idea that its duty was to maintain it, for forty years; when the public authorities of the city have maintained the street with reference to that, have allowed, as we may say, the railroad company to maintain a bridge at that crossing, taking its chances as to its liability in case of accident on such bridge; having constructed and improved the street on both sides of this crossing for all these years with reference to this act of the company and this acquiescence in the situation of affairs; then the question whether such a bridge shall be maintained at that point where it has been maintained by the uninterrupted act of the company for forty years—whether that is the

same question that would be presented if we could place ourselves back to 1854 or '5 in order to determine whether it should originally build a bridge or not, I think is somewhat doubtful. I think other considerations come in, or may come in, to determine of the true view to take of such a case. I think to the ordinary apprehension it would appear to be the law that where the condition of things has remained and been acquiesced in by all parties for forty years, a very clear and definite and overpowering reason should be given why it should be broken up and changed at the instance of one of the parties involved.

Upon the whole case, and without attempting to go into it further, we are unanimously of the opinion that this railroad company is obliged to construct this bridge, or a sufficient bridge, according to the prayer of the petition ; and that will be the order of the court. The costs will be adjudged against the defendant the railroad company.